**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

**TADEUSZ JOZEF WAJLER,**
      **Plaintiff,**

**v.**                                    **Civil Action No. 1:13CV156**
                                              **(The Honorable Irene M. Keeley)**

**CAROLYN W. COLVIN,**
**ACTING COMMISSIONER OF SOCIAL SECURITY,**
      **Defendant.**

## REPORT AND RECOMMENDATION

Tadeusz Jozef Wajler ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I.  PROCEDURAL HISTORY

Plaintiff filed applications for SSI and DIB on April 20, 2011, alleging disability since February 3, 2011, due to dysuria, influenza and related symptoms, myofascial pain syndrome, nausea/vomiting, carpal tunnel syndrome ("CTS"), neuropathy, piriformis syndrome, headaches, and degenerative disc disease/degenerative arthritis of the lumbar spine, status post double discectomy with residual back pain and radiculopathy; history of cervical and thoracic strain; and somatic dysfunction of the thoracic, lumbar, and pelvic areas. The state agency denied Plaintiff's

applications initially and on reconsideration (R. 60-63, 71-76).  Plaintiff requested a hearing,

which Administrative Law Judge Karl Alexander ("ALJ") held on October 11, 2012 (R. at 91). [1]

Plaintiff was represented by counsel, Holly Turkett, Esq., at that hearing and Larry Ostrowski, a

vocational expert ("VE"), testified (R.  34-59). On November 30, 2012, the ALJ entered a

decision finding Plaintiff was not disabled (R. 17-28).  Plaintiff filed a request for review with

the Appeals Council (R. 6-13).   On April 23, 2013, the Appeals Council denied Plaintiff's

request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-5).

## II. STATEMENT OF FACTS

### A.  Personal History

Plaintiff was born on May 2, 1967, and was forty-five (45) years old on the date of the

administrative hearing. (R. 38, 117). He is married and has ten (10) children under the age of

eighteen (R. 117-18).  He graduated high school and attended vocational school for auto body

work (R. 38).  Plaintiff's past relevant work is as an auto body technician from 1988 until his

second back surgery in February 2011. (R. at 177). Plaintiff also worked for approximately one

year in mine shaft construction. (*Id.*).

### B.  Medical History

After prolonged back and leg pain, Plaintiff underwent his first back surgery on October

29, 2009. (R. 262). While he responded well to the surgery initially, his symptoms of back and

leg pain returned by September 2010. (*Id.*). Plaintiff received treatment at a pain management

clinic, received epidural injections and engaged in physical therapy but Plaintiff continued to

---

[1] The cover page of the transcript of the hearing before Judge Alexander erroneously indicates the hearing took place
on August 11, 2011, which is the date the hearing was requested.   Therefore, throughout the administrative record
there are various places where the hearing date may be incorrect.  The hearing was held on October 11, 2012.

experience pain. (*Id.*). On February 3, 2011, Plaintiff underwent his second back surgery, which Plaintiff also alleges was unsuccessful in remedying his pain.

### 1. Medical History Pre-Dating Alleged Onset Date of February 3, 2011

According to the record, Plaintiff received regular primary care treatment from Dr. Edwin J. Morris beginning in November 2005. (R. 227-45). Plaintiff initially presented to Dr. Morris experiencing back, neck and knee pain lasting for over two months in addition to cluster headaches, which he said had been occurring since he was sixteen years old. (R. 245). Throughout his treatment, Plaintiff continued to present to appointments with Dr. Morris experiencing neck and back pain as well as multiple headaches per day. Dr. Morris assessed Plaintiff's conditions as including pirforma syndrome, cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain and lumbosacral sprain/strain and cephalgia or tension headaches. Dr. Morris recommended regular follow-up appointments, often in one week increments. He also recommended Plaintiff utilize a home cervical traction device to address his conditions and at times prescribed hydrocodone for Plaintiff's pain.

Plaintiff had appointments with Dr. Morris on November 8, 2005 (R. 245), November 12, 2005 (R. 244), December 22, 2005 (R. 243), December 29, 2005 (R. 242), January 5, 2006 (R. 241), January 12, 2006 (R. 240), January 26, 2006 (R. 239), February 2, 2006 (R. 238), February 9, 2006 (R. 237), February 23, 2006 (R. 236), March 3, 2006 (R. 235), March 16, 2006 (R. 234), March 30, 2006 (R. 233), April 13, 2006 (R. 232), May 4, 2006 (R. 231), May 18, 2006 (R. 230), June 8, 2006 (R. 229), June 15, 2006 (R. 228), June 20, 2006 (R. 873), June 22, 2006 (R. 227), August 3, 2006 (R. 872), September 14, 2006 (R. 869), September 29, 2006 (R. 868), October 12, 2006 (R. 867), November 9, 2006 (R. 866), November 30, 2006 (R. 865), December 14, 2006 (R. 864), January 4, 2007 (R. 863), January 18, 2007 (R. 862), February 8, 2007 (R. 861),

March 1, 2007 (R. 860), March 22, 2007 (R. 859), May 5, 2007 (R. 858), May 10, 2007 (R. 857),

July 31, 2007 (R. 856), September 29, 2007 (R. 855), January 3, 2008 (R. 854), January 17, 2008

(R. 853), February 11, 2008 (R. 852), March 20, 2008 (R. 851), April 17, 2008 (R. 850), June 5,

2008 (R. 849), July 10, 2008 (R. 848), July 24, 2008 (R. 847), November 22, 2008 (R. 846),

February 26, 2009 (R. 845) and July 30, 2009 (R. 844). Plaintiff presented with back and neck

pain during each of these appointments.

Plaintiff presented to appointments with Dr. Morris with severe headaches on July 20,

2006 (R. 873), August 3, 2006 (R. 872), August 17, 2006 (R. 871), September 29, 2006 (R. 868),

October 12, 2006 (R. 867), January 4, 2007 (R. 863) and February 11, 2008 (R. 852). Plaintiff's

headaches were often accompanied with vomiting. (R. 870, 871, 852). Plaintiff was diagnosed as

having tension headaches as well as cephalgia. Plaintiff was prescribed Topamax and Fioricet to

address his headaches.

On August 6, 2009, Plaintiff had an appointment with Dr. Morris in which he presented

with lower back and left hip pain radiating down his left leg. (R. 843). During the examination,

Dr. Morris noted L1-5 rotated right, sacrum rotated right, piriformis and gluteus minimus trigger

point left anterior and posterior. (*Id.*). Plaintiff was diagnosed with lumbar sprain/strain and

lumbosacral sprain/strain and given a prescription for hydrocodone for his pain. (*Id.*).

On August 13, 2009, Plaintiff presented to Dr. Morris with back, left hip and neck pain.

(R. 841). The examination revealed no acute distress and an elevated first rib (L), (L) piriformis

TP, (L) sacral rotation, L1-5 (L), C2-7 Rotate (L), deep tendon reflexes are symmetrical, lower

ext. bilateral knee jerk and ankle jerk and straight leg raise ("SLR") at 45 percent (L). (R. 841).

Plaintiff was diagnosed with pirforma syndrome, cervical region sprain/strain, dorsal/thoracic

sprain/strain, lumbar sprain/strain and lumbosacral sprain/strain. (*Id.*). Plaintiff was directed to return to the clinic in two weeks and an MRI was scheduled for August 22. (*Id.*).

On August 22, 2009, Plaintiff received an MRI of his lumbar spine, which revealed degenerative disc disease, central at the L4-5 and a small left herniated disc at the L5-S1 level affecting the left S1 nerve root. (R. 253, 255, 281, 343). Dr. Pawar's impressions in full were:

> 1. Broad posterior L4-L5 disk protrusion with deformity of the dural sac and bilateral mild-to-moderate neural foraminal stenosis. Also anterior protrusion of this disk.
> 2. Far left lateral protrusion of L5-S1 disk with edema of the left S1 nerve root.
> 3. Hypertrophic degenerative L4-L5-S1 level facet arthropathy.

(R. 253, 343).

On August 27, 2009, Plaintiff had an appointment with Dr. Morris to review the MRI results. (R. 840). Dr. Morris noted no improvement at all and diagnosed Plaintiff with a herniated lumbar disc. (*Id.*).

The record contains numerous physical therapy records for Plaintiff's treatment with Dr. Kevin Trembush from August 31, 2009 to October 4, 2010. (R. 292-327). The record also includes manual therapy documentation forms and notes regarding the therapeutic procedures applied throughout this timeframe. (R. 352-71). The records indicate treatment for moderate reoccurring chronic pain.

On October 16, 2009, Plaintiff presented to Dr. Julian Bailes, an orthopedic surgeon and Professor and Chairman of the WVU Department of Neurosurgery, with low back and left leg pain beginning in June 2009. (R. 280). Plaintiff reported only temporary improvement from physical therapy. (*Id.*). Plaintiff described the pain as a burning and tingling sensation in the low back, into the posterior left leg to the ankle. (*Id.*). Plaintiff noted that the pain was exacerbated with walking, standing and now lying down; he reported sitting as the best position. (*Id.*). The

8/22/09 MRI results were interpreted by Dr. Bailes as showing degenerative disk disease, central at L4-L5 and a small left L5-S1 herniated nucleus pulpous affecting the left S1 nerve root. Indications for back surgery were discussed and after considering his options, Plaintiff wished to proceed with the surgical intervention consisting of a left L5-S1 microlumbar discectomy. (R. 281).

On October 29, 2009, Plaintiff underwent a left L5-S1 microlumbar discectomy after he was found to have an L5-S1 herniated lumbar disk affecting his left S1 nerve root. (R. 499). During the surgery, the degenerated and herniated disk material was removed. (R. 502). Plaintiff was stable for discharge on October 30, 2009 and was directed to follow-up with Dr. Bailes in two weeks. (R. 500).

On November 10, 2009, Plaintiff presented for a follow-up appointment with the WVU Department of Neurosurgery. (R. 278). Plaintiff complained of discomfort in his left leg with some back pain. (*Id.*). He stated that while initially his left leg pain appeared to be completely resolved after his surgery, he has since been experiencing pain that increases after walking. (*Id.*). Plaintiff's physical examination was overall normal. (*Id.*). It was recommended that Plaintiff return for a follow-up appointment in two weeks and Plaintiff was told to continue his medication and decrease his heightened activity at home. (*Id.*).

On November 23, 2009, Plaintiff presented for a follow-up appointment with the WVU Department of Neurosurgery. (R. 277). Plaintiff reported lessened pain since his initial complaints after the surgery but noted he was still experiencing some back pain and left posterior hip pain, but overall it appears to be improving. (*Id.*). Overall, Plaintiff's physical examination was normal. (*Id.*). It was noted that Plaintiff may improve with some physiotherapy for heat,

massage and ultrasound treatments and recommended that Plaintiff receive physical therapy. (*Id.*). Plaintiff also received prescription pain medication. (*Id.*).

On December 1, 2009, Plaintiff reported to Healthworks Rehab and Fitness for a Lumbar Spine Evaluation. (R. 212). Plaintiff's chief complaints were back pain and left leg pain that started getting worse in June 2009. (*Id.*). Physicians suggested Plaintiff received physical therapy treatment two to three times a week for eight weeks. (R. at 217). Progress notes from December 3, 2009 through December 22, 2009 were included in the record describing the physical treatment and exercises prescribed. (R. 218-26). Plaintiff visited on December 1, 3, 8, 11, 15, 17 and 22. (*Id.*). Plaintiff ended physical therapy on January 6, 2010 because of issues with insurance coverage. (R. 225).

On December 14, 2009, Rolando Garcia, a physician assistant under Dr. Bailes at the WVU Department of Neurosurgery, wrote a letter to Kevin Trembush, Plaintiff's physical therapist, stating that Plaintiff was six weeks post-surgery, still complaining of low back pain and achy sensations across his lower back, but tolerating physical therapy very well and continuing to show improvement. (R. 275-76). On examination, Plaintiff showed no apparent distress and overall normal findings. (R. 275). Mr. Garcia recommended Plaintiff continue with physical therapy for another six to eight weeks with a follow-up in four to six weeks for further evaluation at the clinic. (*Id.*).

On December 17, 2009, Plaintiff presented to Dr. Morris with neck pain and headaches. (R. 838). Plaintiff stated that the pain is usually up his neck and behind eyes. (*Id.*). He stated that Fioricet seems to help his headaches. (*Id.*). During an examination, Dr. Morris noted cervical tender points and assessed Plaintiff's condition as somatic dysfunctional cervical and thoracic. (*Id.*).

On January 11, 2010, Dr. Jacinto Manon, a resident with Dr. Bailes at the WVU Department of Neurosurgery, wrote a letter to Kevin Trembush, Plaintiff's physical therapist. (R. 273-74). Dr. Manon reported that physical therapy seemed to be improving Plaintiff's pain but that Plaintiff presented on January 11 with similar symptoms of low back pain, though less than at his prior visit. (R. 273). Plaintiff admitted to starting work recently with activities involving his lower back and reported exacerbation of pain with physical activity and improvement with rest. (*Id.*). Dr. Manon noted that the pain was stable and not increasing in severity. Dr. Manon stated that at this time, Plaintiff was advised to take nonsteroidal anti-inflammatory drugs as needed for pain, he could restart his physical therapy but is to avoid heavy labor at his job and he can return to the clinic, if needed. (R. 274).

On January 21, 2010, Plaintiff presented to North Marion Medical Associates for an appointment with Dr. Morris. (R. 723). Plaintiff reported having lumbar pain radiating into his legs, that the pain is off and on, and that his legs are very weak and he has difficulty getting up. (R. 723). Plaintiff was prescribed Fioricet at this time for headaches. (*Id.*). Plaintiff received a trigger point injection in his back, was prescribed pain medication, and an MRI was requested. (*Id.*).

On January 27, 2010, an MRI of Plaintiff's lumbar spine was conducted at the Center for Advanced Imaging at WVU Healthcare. (R. 248). The report notes that there were no preoperative MRI films for comparison but the MRI was compared to the radiographs from October 29, 2009. (*Id.*). The MRI revealed:

> Postsurgical changes of left L5-S1 laminotomy with granulation tissue identified in the left central epidural space and neural foramen. The granulation tissue does contact and displaces the left S1 nerve root. Correlate with the left S1 radiculopathy. A distinct evidence for recurrent disk herniation is not seen.

(R. 287, 349). Rolando Garcia, a physician assistant under Dr. Bailes at WVU Department of Neurosurgery described the MRI as revealing "granulation tissue with irritation to the existing left L5-S1 nerve root without any significant disk herniation noted." (R. 272).

On February 22, 2010, Rolando Garcia, a physician assistant working under Dr. Bailes at the WVU Department of Neurosurgery, sent a letter to Kevin Trembush, Plaintiff's physical therapist. (R. 271-72). Mr. Garcia informed Mr. Trembush that Plaintiff was advised to engage in physical therapy three times a week for six to eight weeks with modalities as tolerated only. (R. 272). Mr. Garcia also discussed Plaintiff's current medical condition. Mr. Garcia stated that Plaintiff was in no apparent distress, his gait was steady, motor, sensory and cerebellar functions intact, patient was hyperreflexic with patellar reflexes, straight-leg raise negative bilaterally and Plaintiff was experiencing significant spasms across his lower back on palpation with mild tenderness. (R. 272). Garcia noted that a pain clinic or injections may be an alternative treatment and that surgery is a last resort. (*Id.*).

On March 24, 2010, Plaintiff had an appointment with Ronald Dayo, D.O. for pain management treatment at the WVU Pain Clinic. (R. 382-83). Dr. Dayo noted that Plaintiff's "MRI shows granulation tissue at site of surgery but also some arthritic changes at multiple levels in lumbar spine and an L4-5 disc herniation." (R. 382). Plaintiff described his pain as a three out of ten but increasing to a seven out of ten by the end of the day. (*Id.*). During the examination, Plaintiff was able to stand, stance was neutral, gait was mildly antalgic and he was able to ambulate without devices. (*Id.*). Dr. Dayo indicated he would perform "at least one lumbar epidural steroid injection and see how he responds." (R. 383).

On May 24, 2010, Rolando Garcia, a physician assistant working under Dr. Bailes at the WVU Department of Neurosurgery, wrote a letter to Dr. Morris regarding Plaintiff's condition.

(R. 269-70). In the letter, Mr. Garcia stated that patient had some relief following his October 2009 surgery but that on January 21, 2010 Plaintiff stated he was "taking a bolt off a door and happened to jerk his back and since that time has been complaining of low back pain with radiation to the left buttock area" which occasionally "radiates down to the left lower extremity down to his ankle." (R. 269). Mr. Garcia noted that Plaintiff continues to engage in physical therapy with only temporary relief. (*Id.*). Mr. Garcia proposes that Plaintiff may be a good candidate for long-acting steroid epidural injections to be received at the pain management clinic and sought Dr. Morris's assistance in facilitating the treatment plan. (R. 269-70).

On June 10, 2010, Plaintiff presented to North Marion Medical Associates for an appointment with Dr. Morris. (R. 721).Plaintiff reported pain in his left hip and the physician noted that Plaintiff had surgery to resolve a herniated disc and that scar tissue has developed. (*Id.*). The examination notes state that Plaintiff has problems standing. (*Id.*). The physician recommended Plaintiff receive injections for pain and prescribed hydrocodone. (R. 722).

On August 26, 2010, Plaintiff presented to North Marion Medical Associates for a follow-up appointment with Dr. Morris. (R. 719). Plaintiff was diagnosed with myofascial pain syndrome in his left hip and leg. (R. 720). The physician recommended injections to resolve Plaintiff's pain and prescribed hydrocodone. (*Id.*).

On September 2, 2010, Plaintiff had an appointment with Dr. Morris at North Marion Medical Associates for his back and hip pain. (R. 717). Plaintiff reported no response to the injections and that his headaches have returned. (*Id.*). Plaintiff was diagnosed with recurrent low back pain and an MRI was scheduled. (R. 718).

On September 10, 2010, Rolando Garcia, a physician assistant at WVU Department of Neurosurgery, sent Kevin Trembush, Plaintiff's physical therapist, a letter regarding his

examination of Plaintiff. (R. 332-33). The letter explains that Plaintiff began experiencing worsening pain in July 2010 with pain radiating to the left lateral thigh, leg to his ankle and top of his left foot. (R. 332). Plaintiff had been doing physical therapy recently without significant relief. (*Id.*). The examination revealed a positive straight leg raise bilaterally test, with the left worse than the right at thirty degrees, causing low back and posterior leg pain. (*Id.*). Gait and motor and sensory examination appeared to be normal. (*Id.*). Mr. Garcia informed Mr. Trembush that Plaintiff had been recommended to receive injections and advised to finish a whole course of pain clinic management and considering surgery only as a last resort. (*Id.*).

On September 11, 2010, Plaintiff received an MRI of the lumbar spine at the request of Dr. Morris. (R. 285, 346). The MRI revealed:

> 1. Postsurgical changes of micro discectomy through a left-sided laminotomy at the L5-S1 level are seen as described with granulation tissue surrounding the left S1 nerve root. An underlying disk bulge extending into the neural foramen and contacting the left L5 nerve root. Granulation tissue also extends into the neural foraminal and extraforaminal portion.
> 2. There is a broad-based disk herniation at L4-L5 which is slightly more prominent than the previous examination and contacts the left L5 nerve root as well. Correlate with the left L5 and less likely left S1 radicular symptoms due to these 2 findings.

(*Id.*).

On September 15, 2010, Dr. Kevin Trembush, Plaintiff's physical therapist, sent a letter to Rolando Garcia and Robin Metheny regarding Plaintiff's treatment. (R. 345). The letter states:

> His L sided low back and leg symptoms persist and he had another MRI that showed another disc protrusion at L4-5 and granulation at site of surgery. I feel his recovery has been limited due to the necessity for him to work as an auto mechanic and be bent over the hood of a car all day. Per conversation with [Mr. Garcia], we would like for him to be seen to rule out necessity for another surgery as success for relief may be questionable and therefore request and recommend a left sided transforaminal epidural injection with follow up of six weeks of ultrasound, moist heat, massage and decompression at our office three times per week.

(R. 345). Dr. Trembush also recommended the use of a back brace to decompress and support the area, a home lumbar traction device to allow for more consistent treatment at home and one year of disability to allow for the proper healing of the area. (*Id.*).

On September 20, 2010, Plaintiff presented for an appointment experiencing pain worsening with walking and standing. (R. 268). Plaintiff reported that nothing is giving him significant relief, including physical therapy. (*Id.*). Plaintiff also reported not sleeping well at night. (*Id.*). During the examination, the physician assistant noted "motor and sensory examination testing appear to be intact. Deep tendon reflexes were all 1+ and symmetrical. He had a positive straight leg raise bilaterally, left worse than the right at 30 degrees, causing low back and posterior leg pain. Gait appeared to be normal." (*Id.*). It was recommended that Plaintiff follow-up at the pain clinic for injections and to complete the whole course of pain management as indicated. The physician assistant noted that he may be a candidate to undergo a left L5-4 micro lumbar discectomy ("MLD") but that surgery should only be considered as a last resort. (*Id.*).

On September 22, 2010, Plaintiff had an appointment with Dr. Dayo at the WVU Pain Clinic. (R. 384-85). Plaintiff received an epidural injection, which was "well tolerated and all needles were removed intact." (R. 385). Plaintiff later reported that the injection provided just four hours of relief (R. 515).

In October 2010, Plaintiff experienced a sudden onset of severe back pain and sensory changes of the left lower extremity. (R. 266). Plaintiff rated his pain as ten out of ten and described the pain as sharp and burning, constant. (R. 514). Plaintiff was admitted to the hospital on October 12, 2010. (R. 512). Plaintiff's encounter diagnoses were lumbar herniated disc, low back pain, radiculopathy, numbness and tingling of both legs and neurologic gait dysfunction.

(R. 529). An MRI on October 14, 2010 showed "1. New disc herniation with extruded fragment extending into the left L4-L5 foramen from the L4-L5 disk. Mild central canal stenosis seen due to the disk herniation. 2. Postoperative changes L5-S1 on the left with no recurrent disk herniation." (R. 526). Plaintiff was discharged from the hospital on October 15, 2010 with his pain under control and reported improvement. (R. 244, 513). Plaintiff was told to continue to take his pain medication, naproxen and norco, and to rest for two weeks then continue outpatient physical therapy. (R. 514). Patient stated that he believed he had a front-wheel walker but a requisition was made for him in case he required one. (*Id.*).

On November 1, 2010, Plaintiff presented to the WVU Department of Neurosurgery for a follow up appointment with Dr. Bailes and Dr. Sedney. (R. 266, 414). Dr. Sedney's subjective findings in her Return Outpatient notation were as follows:

> The patient originally had good resolution of his symptoms, but with a return of symptoms in September. He had an MRI at that time revealing a small L4-5 herniated disc versus scar tissue and was sent to pain management clinic for epiducal injections. He reports about 4 hours of relief from that intervention. Later at the beginning of October, the patient had sudden onset severe back pain and sensory changes of the left lower extremity. He was admitted to the hospital with the medical service managing his symptoms. A new MRI showed reportedly an extruded fragment of L4-5 disc. The patient was release from the hospital with his pain under control and reports that since then it has been improving although he continues to take naproxen and norco for pain. He continues to have problems with gait and sensory disturbance along the anterior aspect of his left tibia.

(*Id.*). Dr. Sedney, the resident conducting the exam noted in data review that Plaintiff's MRI suggested "possible slight worsening" compared to the previous study at L4-5 level. (R. at 267, 415). The recommendation section noted as follows:

> 1. Patients pain has decreased from 10 to 4.
> 2. Will have him see pain clinic one more time.

3. Follow-up in 3 weeks to assess progress, +/- surgery at that time.

(*Id.*).

On November 11, 2010, Plaintiff presented to the pain management clinic for treatment of his back pain. (R. 262).

On November 15, 2010, Plaintiff received an epidural injection at WVU Pain Clinic under the supervision of Dr. Navalgund. (R. 386). The procedure was tolerated well. (*Id.*). Plaintiff later reported that pain did not improve with this injection and possibly made it worse. (R. 543).

On November 18, 2010, Plaintiff presented to North Marion Medical Associates for a refill of his pain medication. (R. 715). He reported back pain and pain in his left leg. (R. 832).

On December 20, 2011, Plaintiff had a follow-up appointment with Lindsey Mikeo, a physician assistant for Dr. Bailes. (R. 581). Plaintiff's symptoms included reoccurring back pain and headaches. (R. 583). The examination revealed abnormal and antalgic gait, abnormal muscle strength in the lower extremities, abnormal sensation in left leg, abnormal deep tendon reflexes of left Achilles, a positive left straight leg raise ("SLR") and a positive right cross straight leg raise. (*Id.*). Plaintiff was diagnosed with "pain in soft tissues of limb, lumbago, displacement of lumbar intervertebral disc without myelopathy." (R. 584). After consideration of his options, the risk, benefits and possible complications of surgery were discussed. Plaintiff stated he wished to proceed with a left L4-L5 microlumbar discectomy and he completed a consent form for the surgery at this time. (R. 584, 601-02).

On January 3, 2011, Plaintiff presented to the WVU Department of Neurosurgery for pain clinic evaluation and treatment. (R. 262-65). Plaintiff had been receiving epidural injections at the pain management clinic, which he reported did not improve his pain and possibly made it

worse. (R. 262). Plaintiff reported burning in the left ankle with numbness and pain from his lower back into his left buttock and posterior leg to the dorsum of the foot; Plaintiff reported less pain on the right. (*Id.*). During the physical, the physician's assistant noted that Plaintiff's gait and station were abnormal, his muscle strength in his lower extremities was abnormal with left dorsiflexion and ehl 4/5 and his sensation was abnormal and decreased in his lateral left leg. (R. 264). The physician assistant reviewed the October 14, 2010 MRI, which revealed "new disk herniation with extruded fragment extending into the left L4-L5 foramen from the L4-L5 disk. Mild central canal stenosis seen due to the disk herniation. Postoperative changes L5-S1 on the left with no recurrent disk herniation." (*Id.*). Plaintiff discussed the natural history, film findings and indications for surgery with the physical assistant. (R. 265). Plaintiff still stated he wished to proceed with the surgery. (*Id.*).

On January 21, 2011, Plaintiff presented for a follow-up appointment and preadmission testing with Dr. Bailes. (R. 427). Plaintiff's diagnoses were displacement of lumbar intervertebral disc without myelopathy and pain in soft tissue of limb. (*Id.*). X-rays, an ECG and other laboratory work, including urinalysis, were completed at this time. (R. 433-36).

### 2.    Medical History Post-Dating Alleged Onset Date of February 3, 2011

On February 3, 2011, Dr. Bailes performed an L4-L5 micro discectomy at WVU Department of Neurosurgery for Plaintiff's L4-L5 disk hernation with radiculopathy. (R. 451). The discharge summary notes written by Dr. Yung indicate that the reason for Plaintiff's surgery was that Plaintiff "failed conservative therapy with pain management. Dr. Bailes recommended that the patient undergo a lumbar discectomy." (R. 539). Descriptions of the pre-operative and operation procedures are included in the record. (R. 451-53). The notes indicate that during the procedure:

[t]he disk was incised and using pituitary forceps, curettage and suction, degenerated and herniated disk material was removed. As we worked in a medial direction, we removed degenerated and herniated fragments. This allowed us to access to a large fragment just under this posterior longitudinal ligament which was removed, followed by two more similar size fragments. We evacuated all accessible degenerated and herniated disk material. In conclusion, a large conglomerate amount of disk material coincident with the moderate-size herniation seen on MRI was resected.

(R. 451-52). Plaintiff tolerated the procedure well and was taken to the recovery room in stable condition. (R. 452). A nurse's note on February 4 indicates that Plaintiff was unable to pull his left foot towards himself, which he was able to do before the surgery. (R. 460). Plaintiff was also having pain when he attempted to move his foot. (*Id.*). Plaintiff was discharged on February 4, 2011 with instructions to keep the wound clean and dry and to follow-up in two weeks. (R. 453-55). Plaintiff continued his prescriptions of naproxen and norco (hydrocodone-acetaminophen) for pain upon discharge. (R. 454).

On February 15, 2011, Plaintiff presented for a follow-up appointment after his back surgery. (R. 261). Plaintiff reported left leg pain since the surgery but less than before the surgery. (*Id.*). The physician assistant noted Plaintiff should engage in light ambulation, continue his prescription pain medication and return for an appointment in three to four weeks. (*Id.*).

On March 1, 2011, Plaintiff presented to North Marion Medical Associates for an appointment with Dr. Morris. (R. 713). Plaintiff reported pain at an eight out of ten. (*Id.*). The examination revealed decrease strength and change in range of motion as well as weakness in his left leg. (*Id.*). Plaintiff was diagnosed with a herniated disc L4-L5 with radicular pain in his left leg. (R. 714). The physician noted Plaintiff is to see Dr. Bailes in two weeks for a follow-up appointment. (*Id.*).

On March 14, 2011, Plaintiff presented to the WVU Department of Neurosurgery for a follow-up appointment. (R. 260). Plaintiff reported pain in his lower back and left leg with lower

extremity weakness and numbness in the left leg that is worse after the February 3 surgery. (*Id.*).

Plaintiff also reported occasional spasms at the anterior portion and lateral left leg, which he

described as a burning sensation. (*Id.*). Plaintiff was approved to start physical therapy three

times a week for six to eight weeks, received prescription medications for the spasms and pain

and told to return for a follow-up appointment in four weeks or sooner, if problems. (R. 260).

On March 22, 2011, Plaintiff presented to North Marion Medical Associates for an

appointment. (R. 710). Plaintiff reported that the February 3 surgery still did not relieve his pain

and reported his pain at an eight out of ten. (*Id.*). An examination revealed decrease strength and

change in range of motion. (*Id.*). Plaintiff was diagnosed with radicular pain in his left leg and

lumbar disc disease. (R. 711). Dr. Morris prescribed hydrocodone and recommended Plaintiff try

going to physical therapy. (*Id.*).

On April 7, 2011, Dr. Bailes referred Plaintiff to Dynamic Physical Therapy for treatment

for his lumbar disc herniation with radiculopathy. (R. 729). Dr. Bailes recommended treatment

for two to three times a week for six to eight weeks with goals of decreasing pain and improve

walking up to fifteen minutes. (*Id.*).

Plaintiff had physical therapy appointments on April 11, 2011(R. 735), April 13, 2011 (R.

737), April 18, 2011 (R. 739), April 20, 2011 (R. 741), April 25, 2011 (R. 743) and April 29,

2011 (R. 745). Plaintiff typically performed therapeutic exercises, manual treatment and

interferential current electrical stimulation to his lower back at his appointments. Plaintiff

reported some improvement with the physical therapy, for example, he noted decrease sensations

of burning in his feet after exercises, but he routinely reported continued pain in his back and leg

during the visits.

On April 25, 2011, Plaintiff reported having a migraine headache for four days that was still present. (R. 743).

On April 27, 2011, Plaintiff presented to North Marion Medical Associates for an appointment. (R. 708, 810). Plaintiff reported upper back and neck pain and that his lower back pain had not improved. (*Id.*). Plaintiff also noted that his insurance is about to be terminated. (*Id.*). Plaintiff was diagnosed with a dorsal back strain and chronic low back pain. (R. 709).

On May 2, 2011, Plaintiff presented to WVU Department of Neurology for an appointment and continued to complain of lower back and left leg pain. (R. 779, 786). Plaintiff was diagnosed with back pain and lumbar disc herniation with radiculopathy. (R. 779). Plaintiff continued his norco prescription for pain and an MRI was ordered. (*Id.*). Dr. Bailes noted "unexplained continued pain." (R. 786).

On May 8, 2011, Plaintiff completed a Personal Pain Questionnaire, in which he describes his back pain as aching, burning, throbbing, which lasts continuously. (R. 170). Plaintiff reports that he cannot move to any position without pain and that movement makes pain worse. (*Id.*). Plaintiff reports he is prescribed Hydrocodone for pain and takes one to three pills every four to eight hours. (R. 171). Plaintiff also reported continuous pain in his left leg and right leg and hip. (R. 171-173).

On May 9, 2011, Dr. Bailes provided a letter to Dr. Morris regarding his treatment of Plaintiff, in which he states:

> [Plaintiff] is now three months following his L4-L5 microdiscectomy, which was performed on February 3, 2011. Overall, he is not improving. He has had a trial of postoperative physiotherapy. He has had several medications and rest and he is not responding. He continues to complain of significant radicular pain in his lower extremities. Examination shows a normal neurological examination. His incision is well healed without erythema or swelling. I am at a lost to explain his recurrent pain.. I have recommended we obtain a follow-up MRI scan with contrast to get a good internal look.

(R. 258).

On May 12, 2011, Plaintiff presented for an appointment with Dr. Bailes experiencing continued lower back and left leg pain. (R. 290). Dr. Bailes noted that the surgery was only minimally effective and Plaintiff experienced unexplained continued pain. (*Id.*).

On May 16, 2011, Plaintiff received an MRI of his lumbar spine. (R. 749). The MRI revealed: "Postoperative changes at L5 with enhancing epidural scar tissue encasing the left L5 nerve root in the lateral recess causing some root sleeve dilatation. There is residual mild canal narrowing and bilateral moderate foraminal narrowing at the L4-L5 level due to a disk bulge." (R. 749).

On May 16, 2011, Plaintiff also had an appointment with Rolando Garcia, a physician assistant with Dr. Bailes at the WVU Department of Neurology. (R. 788). Plaintiff's diagnoses were lumbar disc herniation with radiculopathy and back pain. (*Id.*). Procedure notes by Mr. Garcia, noted that "there appears to be a new disk herniation on the left side at L4-L5 consistent with his symptoms. He describes that the low back pain and lower extremity is only gradually improving. He still complains of occasional spasms." (R. 750). Mr. Garcia stated that Plaintiff may continue physical therapy and non-steroidal anti-inflammatory drug prescriptions and that he is to try pain management at the WVU Pain Clinic. (R. 750, 788).

On August 16, 2011, Plaintiff had an appointment with Dr. Morris at North Marion Medical Associates. (R. 808). Plaintiff presented with neck and shoulder pain in addition to lower back and left leg pain and also reported that his arms were falling asleep. (*Id.*). Plaintiff reported that this last surgery did nothing to help him. (*Id.*). He stated his pain is at an eight out of ten. (*Id.*). During the examination, Dr. Morris commented that Plaintiff had marked difficulty with using his left leg. (R. 808). Dr. Morris also noted that Plaintiff is walking with a cane at this

time. (*Id.*). Dr. Morris assessed Plaintiff's condition as failed back surgery and herniated lumbar disc. (R. 809). Dr. Morris also completed a "Disability Certificate" on this date which states that Plaintiff has been incapacitated from February 3, 2011 to present and is still unable to return to work. (R. 818).

On August 30, 2011, Plaintiff presented to North Marion Medical Associates for an appointment with Dr. Morris. (R. 806). Plaintiff presented with pain, numbing and a burning pain in his left leg and lower back. (*Id.*). Plaintiff reported problems with his left leg giving out on him since his last surgery. (*Id.*). The pain goes from his lower back and hip down into his lateral leg to the knee and into the foot. (*Id.*). Plaintiff stated his pain was at a nine out of ten. (*Id.*). During the examination, Dr. Morris noted he was having problems getting up and down. (*Id.*). His diagnosis was chronic lower back pain with radiation into his left leg. (R. 807).

On September 12, 2011, Dr. Morris wrote a letter stating in full: "Tadeusz Wajler walks with a cane. He has problems walking, standing and sitting because of constant pain in his lower back and left leg. He is unable to work because of these problems." (R. 817).

On October 17, 2011, Plaintiff had an appointment with Dr. Morris at North Marion Medical Associates. (R. 826). Plaintiff reported no change in his back pain and that the prescribed Percocet was bothering his stomach. (*Id.*). He reported his pain was at an eight out of ten. (*Id.*). Plaintiff stated that he had received two epidurals and they have not helped. (*Id.*).

On October 28, 2011, Dr. Richard Vaglienti noted that "patient was evaluated here in the past and had two epidurals with no benefit. He was then lost to follow up. His present insurance coverage will not allow spinal cord stim or pump implant." (R. 823). Plaintiff subsequently did not appear for appointments scheduled for November 8 and 10. (*Id.*).

On January 16, 2012, Plaintiff had an appointment with Dr. Morris at North Marion Medical Associates. (R. 825). Plaintiff described his pain at a seven out of ten. (*Id.*). Plaintiff stated that he lost his insurance coverage. (*Id.*).

On May 2, 2012, Plaintiff received an MRI of his lumbosacral spine. (R. 874, 881, 919). The MRI as compared with the MRI conducted on May 16, 2011. (*Id.*). The MRI revealed:

> There is mild retrolisthesis of L4 relative to L5. There is no evidence for acute bony abnormality. Vertebral body height is preserved. There is loss of disk space height at L5-S1 with loss of normal high T2 signal intensity.
> T12-L1: There is no central canal or neural foramen stenosis.
> L1-L2: No central canal or neural foraminal stenosis.
> L2-L3: There is mild facet arthropathy. No central canal or neural foraminal stenosis.
> L3-L4: There is mild facet arthropathy without central canal or neural foraminal stenosis.
> L4-L5: The patient is status post micro discectomy at this level. There is a diffuse disk bulge extending into this inferior neural foramina bilaterally and also along the lateral recesses. Again seen is mild lateral recess stenosis with L5 root impingement, unchanged from prior study. There is also enhancement seen related to epidural scar tissue in the left lateral recess, encasing the L5 right lateral recess stenosis, also unchanged from prior study. There is also thickening and enhancement of the left L5 nerve unchanged from prior study.
> L5-S1: There is bilateral facet arthropathy and diffuse disk bulge. There is no central canal or neural foraminal stenosis. Again seen is enhancing epidural scar tissue from L5 laminectomy with no central canal or neural stenosis.

(*Id.*). The impression of the MRI was "Enhancing epidural scar tissue encasing the left L5 nerve root and lateral recess, unchanged from prior study. No new abnormalities." (*Id.*).

On May 2, 2012, an x-ray was also taken of Plaintiff's lumbosacral spine. (R. 918). The x-ray was compared to prior lumbar spine films dated February 3, 2011. (*Id.*). Dr. Daniel Digiovine made the following findings: "redemonstration of early degenerative changes at the L4-L5 and possibly L5-S1 levels. No acute compression deformity or traumatic malalignment is identified. Vertebral body alignment is well preserved without evidence for spondylolisthesis." (*Id.*). The impression was: "1. No acute compression deformity. 2. Minimal degenerative change at L4-L5 and L5-S1 levels." (*Id.*).

On May 23, 2012, Plaintiff had an appointment with Dr. David Lynch, an Assistant Professor at the WVU Department of Orthopedics. (R. 921-22). Dr. Lynch reviewed Plaintiff's history of present illness, which included his first back surgery on October 29, 2009, followed by chronic, persistent left leg pain since the surgery, his referral to the pain clinic for lumbar epidural steroid injections without any long-term improvement, and MRI's which show granulation tissue with irritation exiting nerve root at the left L5-S1 level and enhancing scar tissue encasing the left L5 nerve root. (R. 921). Plaintiff reports constant daily pain 24/7 with pain a nine out of ten in his left leg. (*Id.*). Plaintiff states that he takes approximately six hydrocodone a day and has been unemployed since February 2, 2011. (*Id.*). Plaintiff's symptoms included "chronic stiffness in the low back, depression, anxiety, frustrated because he relates thing are not as well as before. He relates he gets intermittent numbness down the right leg while driving, but has chronic left leg pain." (*Id.*). The physical examination revealed: "neurologically, strength is grossly intact at 4+ -5/5 throughout. Ton is normal. Plantar response is down going. Reflexes 2/4." (R. 922). Dr. Lynch's impression was: "Chronic lumbar radiculopathy. He reported 2 disc surgeries L4-L5 on the left. Most recent MRI reviewed by Dr. France noted DDD at L4-L5. He has failed back syndrome, chronic lumbar radiculopathy, left leg with scar tissue around the left L5 nerve root." (*Id.*). Dr. Lynch recommended a trial of gabapentin (Neurontin) or a longer acting pain medicine once or twice a day. (*Id.*). Dr. Lynch also gave him a prescription for physical therapy for some core strengthening, stretching, range of motion and some home exercises. (*Id.*).

On May 25, 2012, Plaintiff had an appointment with Dr. Morris at North Marion Medical Associates. (R. 878). Plaintiff reported seeing Dr. David Lynch who recommended a prescription of Neurontin or a new long-acting pain medication. (*Id.*). Plaintiff stated that he is unable to walk

without pain medication. (*Id.*). Dr. Morris noted that Plaintiff has to walk with a cane. (*Id.*). Plaintiff was diagnosed with chronic back pain, neuropathy and carpel tunnel syndrome. (R. 879-80). Plaintiff also received wrist brace and was prescribed Neurontin in addition to hydrocodone. (R. 880).

On June 25, 2012, Plaintiff presented to an appointment with Dr. Morris at North Marion Medical Associates with both hands falling asleep at night and when driving third and second digit numbness. (R. 877). Plaintiff received refills for hydrocodone at this visit. (*Id.*).

## C.    Testimonial Evidence

A hearing before ALJ Alexander was held on October 11, 2012 in Morgantown, West Virginia.[2] Plaintiff testified that he is married and has ten children ranging in age from one year to twenty years old. (R. 40). Plaintiff currently receives food stamps and is not receiving any other disability insurance, pensions or welfare assistance. (R. 41).

Plaintiff testified that he graduated high school and then went to eight months of vocational auto body school. (R. 38). Plaintiff testified he previously worked as an auto body technician at Center Service Auto Body for approximately eight or nine years. (R. 39). Prior to that position, Plaintiff worked at a coal mine shaft company and another auto body shop in Pennsylvania. (R. 40).

When asked what his worst medical problems are, Plaintiff stated his headaches and back pain. (R. 42). In regard to his headaches, Plaintiff stated that he experiences severe headaches or migraines that result in nausea and require him to lie or sit down. (R. 42). The headaches occur approximately three times a month and last for about three days. (R. 42). When asked "…what are you able to do during those three days?" Plaintiff testified "Nothing." When asked "How do

---

[2] The cover page of the transcript of the hearing before Judge Alexander erroneously indicates the hearing took place on August 11, 2011, which is the date the hearing was requested.

you treat it?" Plaintiff testified, "There's nothing to treat. I tried getting treatment. There's nothing that helps. Even the pain medicine that I take now for my back don't help none." (R. 42-43).

In regard to his back pain, Plaintiff testified that he has head two surgeries and went through physical therapy after both. (R. 43). He stated that the pain is in his lower back and extends down his left leg; the pain is constantly present and Plaintiff described the pain as a burning numb sensation. (R. 44, 52). Plaintiff explained that before his first surgery the pain was at a ten on a scale of one to ten. (R. 43). Plaintiff's first surgery was on October 29, 2009. (R. at 499). Plaintiff stated that after the first surgery, he went back to work in January of 2010. (R. at 43). One or two weeks after he went back to work his back started hurting again. (R. 43). Although Plaintiff can't remember the dates, he went to the hospital for the pain some time after his first surgery and they admitted him. (R. at 43). Plaintiff testified that they did an MRI at that time and the doctors told him that "the disc burst and fragmented everywhere." (R. 44). Thereafter, Plaintiff testified that he had another surgery and went to therapy but still experienced constant pain. (R. 44). Plaintiff further testified that after his second surgery, he attempted to go back to work for one day and he "couldn't do it." (R. 53).

In regard to his ability to walk, Plaintiff testified that his legs are weak and it is hard to get up and walk so he uses a cane for assistance. (R. 44). Plaintiff testified that he is not able to walk without the cane and that he could walk for approximately one block before experiencing debilitating pain. (R. 44, 46). Plaintiff explained that he did not receive a prescription for the cane because he no longer has insurance so he purchased his current cane at a thrift store. (R. 44). Dr. Morris, however, did recommend that Plaintiff use the cane, which he has used since the summer of 2011. (R. 44). Plaintiff testified he can stand for about ten minutes before the pain

becomes debilitating and Plaintiff stated that on a good day, he can sit for about fifteen minutes before he has to stand. (R. 45). He is not able to bend or squat. (R. 46). He is able to go up and down "a few" stairs but "it's hard." (R. 49). Plaintiff states he has "bad days" about four times a week in which he cannot "do anything." (R. 46). He testified that he is not able to pick up his one-year daughter, who weighs approximately twenty pounds. (R. 46). He further testified that he is not able to take care of his children and that his wife is the primary caretaker. (R. 48).

In regard to medications, Plaintiff testified that he is currently prescribed hydrocodone. (R. 48). Plaintiff described side effects as including feeling tired, experiencing some depression and his thinking being "cloudy" as if he cannot think straight. (R. 48). In regard to his reading and writing skills, Plaintiff testified that is able to read, write and make simple change but that his "attention span is not…where it needs to be" because of the pain and medication. (R. 41). Plaintiff also testified regarding his physical therapy treatment. (R. 49). Plaintiff explained that he no longer exercises and that he did not find physical therapy to give him relief. (R. 49).

As to his personal care and hygiene, Plaintiff testified that he is able to bathe and will sit in the hot tub for pain relief. (R. 48). He stated his wife washes his feet and back and assists him in getting in and out of the tub as well as drying off his legs and feet. (R. 48). In regard to sleep, Plaintiff testified that his pain affects his sleep because of the need to constantly change positions. (R. 48-49). As to other activities of daily living, Plaintiff explained he has difficulty with his appetite when the pain is severe. (R. 49). Plaintiff further testified that he is able to drive short distances but his wife drove to the hearing so he was able to recline in the car seat during the forty-five minute drive to the hearing. (R. 50). As to hobbies, Plaintiff testified that he is no longer able to engage in his previous activities, such as hunting, fishing, camping and beekeeping. (R. 51). He supervises his sixteen year old son who is learning beekeeping but is not

able to pick up boxes or stand. (R. 51). Plaintiff testified that he tries to attend church Sunday

mornings, Sunday night and Wednesdays but that he usually misses services. (R. 52).

An additional condition Plaintiff testified to at the hearing is carpal tunnel, which results

in his hands falling asleep and difficulty holding on to objects. (R. 50-51). Plaintiff explained

that he just recently began discussing the symptoms with Dr. Morris. (R. 50).

**D.     Vocational Evidence**

Also testifying at the hearing was Larry Ostrowski, a vocational expert. Mr. Ostrowski

characterized Plaintiff's past work as an automobile body repairer as medium and skilled. (R.

55). He classified Plaintiff's past work as in mine shaft construction work as heavy and semi-

skilled. (R. 55-56).

With regards to Plaintiff's ability to return to his prior work, Mr. Ostrowski gave the

following responses to the ALJ's hypothetical:

> Q:     Would you assume a hypothetical individual of the claimant's age, educational
> background and work history who would be able to perform a range of sedentary
> work, would require a sit, stand option without breaking task and the ability to sit,
> stand and walk for about 15 minutes at a time each. To the maximum extent
> possible should walk on level and even surfaces, could perform postural
> movements occasionally except should do minimal squatting and climbing of
> ladders, ropes or scaffolds, should not be exposed to temperature extremes, what
> are [sic] humid conditions or hazards, would use a cane for ambulation and would
> at this time be limited to unskilled work involving only routine and repetitive
> instructions and tasks. Would there be any work in the regional or national
> economy that such a person could perform?
>
> (Mr. Ostrowski and the ALJ then clarified that there would be no limitations on
> interaction with the general public, co-workers and supervisors?
>
> A:     With all of this clarification, your Honor, yes…there would be work of
> surveillance system monitor…sedentary and unskilled…[and]…charge account
> clerk…sedentary and unskilled…[and]…telephone quotation clerk...sedentary and
> unskilled.

When asked if his testimony was inconsistent with the DOT, Mr. Ostrowski replied in the

negative "with the exception of there being a sit, stand option posed in the hypothetical." (R. 57).

Mr. Ostrowski explained that the sit, stand option is not defined in the DOT and is based on Mr. Ostrowski's personal knowledge and opinion. (R. 57-58).

Plaintiff's attorney questioned Mr. Ostrowski as well. In response to the attorney's question about tolerance for absences, Mr. Ostrowski testified "that employers will tolerate incidents of being late for work, leave work early and missing an entire day and they will tolerate the maximum of two incidents per month on an ongoing basis before the individual may experience consequences regarding the incidents." (R. 58). In regard to being off task because of pain or the need to change position, Mr. Ostrowski testified that "[t]here are studies that show that an individual can be off task up to ten percent and generally still be able to maintain the required levels of productivity. If an individual were to be off task more than ten percent on an ongoing basis, [they] generally will lose their job." (R. 58).

**E.    Additional Vocational Evidence**

A physical residual functional capacity assessment was completed by Dr. Fulvio Franyutti, a medical consultant, on June 2, 2011. (R. 797-804). The assessment states that Plaintiff can occasionally lift or carry twenty pounds, can frequently lift or carry ten pounds, can sit for a total of six hours in an eight hour workday, can stand or walk for a total of two hours a day in an eight hour work day and can push and/or pull for unlimited amount of time. (R. 798). Plaintiff can occasionally climb, balance, stoop, kneel, crouch or crawl and can never balance. (R. 799). Plaintiff is to avoid concentrated exposure to extreme cold, extreme heat, vibration and hazards, such as machinery and heights. (R. 801). Dr. Franyutti found Plaintiff's statement regarding his abilities to be partially credible. (R. 804). The assessment was affirmed by Thomas Lauderman, D.O. on June 14, 2011. (R. 805).

A report of contact form from Social Security Administration completed on June 3, 2011 by Christine Sias listed Plaintiff's exertional level as sedentary with restrictions on walking and standing. (R. 185). The form notes that Plaintiff cannot perform past work but is able to perform other work in the national economy, including a call-out operator, surveillance system monitor and nut sorter. (*Id.*).

A report of contact form from Social Security Administration completed on July 14, 2011 by Richard L. McCullough listed Plaintiff's exertional level as sedentary with postural and environmental limitations. (R. 194). The form notes that Plaintiff cannot perform past work but is able to perform other work in the national economy, including a call-out operator, charge-account clerk, and escort-vehicle driver. (*Id.*).

**F.      Lifestyle Evidence**

On an Adult Function Report dated May 8, 2011, Plaintiff noted that he was unable to stand or walk without limping and experiencing pain. (R. 159). He stated that sitting is always painful and he can only sit for twenty to thirty minutes before needing to change position. (*Id.*). Plaintiff notes he attempts to walk an average of thirty minutes a day but often must stop and lay down. (R. 163). Plaintiff reports difficulty staying asleep due to waking up to change position because of pain. (*Id.*). Plaintiff's wife assists him with putting on socks and shoes but otherwise Plaintiff notes he does not need assistance for other personal care activities. (*Id.*). Plaintiff does not cook or prepare meals. (R. 164). In regard to house and yard work, Plaintiff states he tries to help his family but he is unable to assist with these jobs. (*Id.*). Plaintiff notes that he goes outside almost daily either on the porch or around the house. (R. 165). Plaintiff reports that he is able to drive a car but only for short distances. (*Id.*). In regard to shopping, Plaintiff reports that he goes grocery shopping with his wife about once a month. (*Id.*). As for hobbies and interests, Plaintiff

reports that he can no longer hunt because he cannot walk enough and he can no longer work as a beekeeper without assistance. (R. 166). Plaintiff notes he attends church approximately three times a week. (*Id.*). Plaintiff further reports limitations in lifting, squatting, bending, standing, walking and sitting. (R. at 167). Plaintiff notes that he cannot stand for more than a few minutes without leaning on something, cannot walk more than thirty minutes and must change positions frequently if sitting. (*Id.*). He states that he needs his family's help to get up or down. (R. 168). In regarding to mental abilities, Plaintiff reports that he is able to finish what he starts, is able to follow written and spoken instructions, and handles stress and changes in routine well. (R. 168).

### III.   CONTENTIONS OF THE PARTIES

Plaintiff, in his brief for judgment on the pleadings, asserts that the Commissioner's decision is not supported by substantial evidence.  (Pl.'s Br. at

 15). Specifically, Plaintiff alleges that:

- The ALJ's conclusion that Mr. Wajler's testimony concerning his pain and limitations due to back and left leg pain was not credible is not supported by substantial evidence; and,

- The vocational expert testimony is not substantial evidence showing that there are jobs in significant numbers in the national economy that Mr. Wajler can perform.

(Id. at 14-15).  Plaintiff asks the Court to reverse the Commissioner's decision.  (Id. at 16.)

Defendant, in her brief in support of her motion for summary judgment, asserts that the decision is supported by substantial evidence and should be affirmed as a matter of law.  (Def.'s Br. at 15).  Specifically, Defendant alleges that:

- The ALJ's credibility analysis is supported by substantial evidence; and

- The ALJ reasonably relied on the VE's testimony and reports of contact as substantial evidence that there are jobs that exist in the national economy that Mr. Wajler can perform.

(Def.'s Br. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 8, 12).

# IV. STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the

following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to
> determining whether the findings . . . are supported by substantial evidence and
> whether the correct law was applied.  See 42 U.S.C. § 405(g) ( "The findings .
> . . as to any fact, if supported by substantial evidence, shall be conclusive . . .
> ."); *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971);
> *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported
> by substantial evidence" means "such relevant evidence as a reasonable person
> might accept as adequate to support a conclusion."  *Richardson v. Perales*,
> 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*,
> 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938))…If there is evidence to justify a
> refusal to direct a verdict were the case before a jury, then there is "substantial
> evidence."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  Thus, it is
> not within the province of a reviewing court to determine the weight of the
> evidence, nor is it the court's function to substitute its judgment . . . if the
> decision is supported by substantial evidence.  *See Laws v. Celebrezze*, 368
> F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  The Fourth Circuit has defined

substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a

particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat

less than a preponderance."  *Laws*, 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's

conclusion, "[t]his Court does not find facts or try the case de novo when reviewing disability

determinations."  *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976).  Furthermore,

"the language of § 205(g) . . . requires that the court uphold the decision even should the court

disagree with such decision as long as it is supported by 'substantial evidence.'" Blalock v.

Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V.    DISCUSSION

## A.    Standard for Disability and the Five-Step Evaluation Process

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006).  The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i)   At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.

(ii)  At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s).  If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.
      [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv)  At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.

(v)   At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011).  If the claimant is determined to be disabled or not disabled at a step, the process does not proceed to the next step.  *Id.*

## B.   Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. **The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.**

2. **The claimant has not engaged in substantial gainful activity since February 3, 2011, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).**

3. **Since February 3, 2011, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited his ability to perform basic work activities for a period of at least 12 consecutive months: history of degenerative disc disease/degenerative arthritis of the lumbar spine, status post double discectomy with residual back pain and radiculopathy; history of cervical and thoracic strain; and somatic dysfunction of the thoracic, lumbar, and pelvic areas (20 CFR 404.1520(c) and 416.920(c)).**

4. **The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

5. **After careful consideration of the entire record, the undersigned finds that, since February 3, 2011, the claimant has had the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following limitations: the claimant requires a sit/stand option without breaking task, with the ability to sit, stand, and walk for at least 15 minutes each at a time; the claimant can perform postural movements occasionally, but should do minimal squatting and cannot climb ladders, ropes, or scaffolds; to the maximum extent possible, the claimant should do all walking on level and even surfaces, and the claimant requires a cane for ambulation; the claimant should have no exposure to temperature extremes, wet or humid conditions, or hazards; and lastly, the claimant is limited to unskilled work involving only routine and repetitive instructions and tasks.**

6. **The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

7. **The claimant was born on May 2, 1967 and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).**

8.         **The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).**

9.         **Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

10.       **Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).**

11.       **The claimant has not been under a disability, as defined in the Social Security Act, from February 3, 2011 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

(R. at 17-28).

## C.     Findings of Fact and Conclusions of Law

**1. The ALJ's credibility analysis is supported by substantial evidence even though the Court finds two errors.**

The Plaintiff asserts that the ALJ misread the objective medical evidence in considering Plaintiff's credibility and therefore substantial evidence does not support his decision. (Pl.'s Brief at 11). The determination of whether a person is disabled by pain or other symptoms is a two-step process. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* 20 C.F.R. § 404.1529(c)(1); SSR 96-7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medial evidence impairment capable of causing the degree and type of pain alleged. *See Craig*, 76 F.3d at 594. In this case, the ALJ found that "…the medically determinable impairments could reasonably be expected to cause some of the alleged symptoms;…" satisfying the first prong of this test.

Second, once this threshold determination has been made, the ALJ considers the

credibility of his subjective allegations of pain in light of the entire record. *Id.*

Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of an individual's subjective allegations of pain, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and,

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984).

A review of the record shows that the ALJ complied with both *Craig* and 20 C.F.R. § 404.1529(c)(3). Specifically, the ALJ considered and evaluated the objective medical evidence of record and Plaintiff's activities of daily living; his statements about the location, duration,

frequency, and intensity of his pain; the precipitating and aggravating factors that caused his pain; the treatment he underwent to mitigate pain; and other factors relative to Plaintiff's condition.

Plaintiff asserts that in step two when the ALJ considered the credibility of Plaintiff's subjective allegations of pain in light of the entire record that the ALJ misread the objective medical evidence. (Pl.'s Brief at 11). Accordingly, Plaintiff argues that the ALJ's determination that "…the claimants statements concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent they are inconsistent with the …residual functional capacity assessment," was not supported by substantial evidence. (R. at 22).

Specifically, the Plaintiff claims the following errors in the ALJ's decision: (a) The ALJ got the chronology of the MRI wrong and stated in his decision that the January 27, 2010 MRI indicates that granulation tissue did **NOT** contact the S1 nerve when the study says it did. (b) There is objective evidence that there was nerve compression at the time of Plaintiff contends he became disabled. (c) ALJ misstated the medical evidence concerning Plaintiff's response to pain management efforts after the first surgery, erroneously saying Plaintiff's pain was controlled with Naproxen and NORCO (d) ALJ faulted Plaintiff for not pursuing further pain management while at the same time noting that two epidural injections had provided no relief. (Pl.'s Brief at 11-13).

In assessing each of these claims, the Court will look to see whether in fact there are errors in the ALJs decision and whether these errors were consequential to the RFC determination and the ultimate nondisability determination. "The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d

1035, 1038 (9th Cir. 2008); *see also Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003)

(stating that "[t]he doctrine of harmless error . . . is fully applicable to judicial review of

administrative decisions"); *Hurtado v. Astrue*, 2010 WL 3258272, at *11 (D.S.C. July 26, 2010)

(finding that "[t]he court acknowledges there may be situations in which an error in an opinion is

harmless because it would not change the outcome of the ALJ's decision"); *cf. Ngarurih v.

Ashcroft*, 371 F.3d 182, 190 n. 8 (4th Cir. 2004) (explaining that "[w]hile the general rule is that

an administrative order cannot be upheld unless the grounds upon which the agency acted in

exercising its powers were those upon which its action can be sustained, reversal is not required

where the alleged error clearly had no bearing on the procedure used or the substance of the

decision reached.").

  The two errors discussed below involved pre-alleged onset medical records.  Since these

errors involved pre-alleged onset medical records, the undersigned finds that the errors would not

have been as critical to the ALJ's credibility analysis in determining the Plaintiff's RFC as would

post alleged onset errors.  It appears to the court that there are no errors in the ALJ's credibility

analysis regarding issues after February 3, 2011, which is the alleged onset date, and the time

period most critical to forming the RFC and making the ultimate determination in this case.

  (a) **The ALJ got the chronology of the MRI wrong and misstated that the January 27, 2010 MRI indicates that granulation tissue did NOT contact the S1 nerve when the study says it did**.

  In the ALJ's decision,  the ALJ correctly indicates that there are four MRI's prior to the

alleged onset date (R. at 22).   There were MRI's on August of 2009 (R. at 253);  January 27,

2010. (R. 248,  287);  September 11, 2010. (R. at 285, 346) and October 14, 2010 MRI[3] (R. at

264). The October MRI would have been the last MRI prior to the alleged onset date.

---

[3] There is reference to the October 14, 2010 MRI but the actual MRI is not in the record.

However, the ALJ incorrectly states that the last of the pre-alleged onset date MRI studies is the January 27, 2010, MRI. (R. at 23). The ALJ further misstates that the January 27, 2010 MRI indicates that granulation tissue did **NOT** contact the S1 nerve when the study says it did. (*Id.*).

The ALJ states as follows: "The last of the pre-alleged onset date MRI studies continued to show the post-surgical changes at L5-S1 with granulation tissue indicated, however, the granulation tissue was not shown to contact or displace the left S1 nerve root nor was there evidence any recurrent disc herniation." (R. at 23).

The MRI from January 27, 2010, reads as follows:

> Postsurgical changes of left L5-S1 laminotomy with granulation tissue identified in the left central epidural space and neural foramen. The granulation tissue does contact and displaces the left S1 nerve root. Correlate with the left S1 radiculopathy. A distinct evidence for recurrent disk herniation is not seen.

(R. at 248). It is clear that the ALJ incorrectly noted that this MRI was the last of the pre-alleged onset MRI's, when actually it was the first MRI after the Plaintiff's first surgery. Additionally, it is clear that the ALJ incorrectly noted that the granulation tissue does NOT contact and displace the left S1 nerve root when in fact the MRI shows it did contact the S1 nerve root.

The issue before this court is whether these errors were consequential to the ALJ's credibility determination in formulating the RFC or was consequential in the ALJ's ultimate nondisability determination. "The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti*, 533 F.3d 1035, 1038 (9th Cir. 2008). It is clear from the record that these errors involved one medical record involving the Plaintiff's pre-alleged onset conditions. In this case, there were many factors the ALJ used in assessing the Plaintiff's credibility. First, the ALJ discusses the four MRI's pre-alleged onset date. Although

his references to the January 27, 2010 MRI are incorrect, his references to the other three MRI's, including one from September 2010 and one from October 2010, only 4 months before his second surgery have no errors.

Second, the ALJ takes issue with the Plaintiff's testimony at the hearing that headaches are one of his two worst medical problems and that he doesn't treat the headaches because nothing helps. (R. at 42-43). The ALJ points out that the medical records show that Plaintiff has had cluster headaches since he was 16 years old. (R. at 23). Further, the medical records show that Plaintiff got relief from medication for his headaches and that headaches have scarcely been reported in the medical records since 2006. (*Id.*). Additionally, the ALJ indicates that Plaintiff was substantially gainfully employed until 2010 despite Plaintiff's allegation of total disabling headaches which began approximately in 1983. (*Id.*) There are many other factors the ALJ discusses in making his credibility analysis. Along with the headaches there was a period of time from March 2011 through May 2011, where Plaintiff was experiencing pain that the doctors could not explain. (R. at 23). An MRI was eventually ordered but the ALJ notes that although the MRI showed 'scar tissue encasing the left L5 root,' there was only "some" sleeve dilation and only residual 'mild' canal narrowing and 'moderate' foraminal narrowing at the L4-L5 level due to disc bulge." (R. at 23-24). These findings were all related to post alleged onset pain and symptoms.

Although an incorrect reading of MRI on January 27, 2010, may have had some effect on the ALJ's decision on credibility, the undersigned finds that the error was regarding only one pre-alleged onset medical record and that the ALJ's other findings regarding the headaches and the post alleged onset MRIs substantially supported the ALJ's credibility analysis as it related to the RFC and ultimate nondisability determination. Therefore, the undersigned finds that the

ALJ's error in referencing the January 27, 2010 MRI was inconsequential to the ALJ's RFC determination and nondisability finding in this case and was therefore harmless error.

> **(b) There is objective evidence that there was nerve compression at the time of Plaintiff contends he became disabled.**

The Plaintiff alleges that there is objective evidence that there was nerve compression at the time of the Defendant's second surgery. (Pl.'s Brief at 11). The Plaintiff cites to the LMR report of Dr. Bailes in which he describes the surgery and what was found on February 3, 2011. (*Id.*). Again, this issue reverts back to pre-alleged onset date and Plaintiff's argument that the one mistake with the January 27, 2010, MRI tainted the ALJ's credibility determination of the Plaintiff. Although certainly that was a factor in the ALJ's decision, during his credibility analysis, the ALJ clearly states that after the second surgery there was "…scar tissue encasing the left L5 root…." (R. at 23). Accordingly, whether or not the ALJ believed there was nerve compression prior to the second surgery, he certainly is clear that there was nerve encasing after the second surgery which is the post alleged onset period and the period of time he was making the RFC determination. If error exists, the undersigned finds once again that it is harmless error.

> **(c) ALJ allegedly misstated the medical evidence in three ways concerning Plaintiff's response to pain management efforts.**

Plaintiff alleges that the ALJ erred in three ways regarding his findings as to pain management. (Pl.'s Brief at 11). The first two alleged misstatements involve the following paragraph in the ALJ's decision:

> Although the claimant, just prior to February 3, 2011, the alleged onset date, reported that his pain was under control and improving with the use of Naproxem and Norco for pain and he denied sleep problems and indicated he was independent in his personal care, he elected to undergo a second…"surgery.

(R. at 23).  The Plaintiff alleges that "Nowhere in the exhibits cited for this proposition does a doctor indicate that Mr. Wajler's pain was being controlled by naproxen and norco."  (Pl.'s Brief at 11).

On November 1, 2010, Dr. Sedney  of WVU Healthcare reported to Dr. Bailes that the Plaintiff has good resolution of his symptoms until September 2010.  (R. at 414).  In October, Plaintiff was admitted to the hospital for sudden onset severe back pain.  *(Id.)*.  A new MRI reportedly showed an "extruded fragment of the L4-5 disc. (*Id*.).  "The patient was released from the hospital with his pain under control and reports that since then it has been **improving** although he **continues to take naproxen and norco for pain**." (emphasis added, *Id*.).  Records show that he continued to take Naproxen and Norco for pain even as late as January 3, 2011.

The undersigned finds that the above medical records do support the ALJ's statement to some degree. Although there is nothing in the record stating Plaintiff "denied sleep problems" during this time; perhaps, the ALJ's misreading of the MRI dated January 27, 2010 was again a factor in this credibility finding.  However, since this confusion is with regard to only one MRI prior to the second surgery, the undersigned finds the error is inconsequential to the ALJ's credibility determination as it relates to the RFC and the ultimate decision in this case . Therefore, if there was error, it was harmless.

Second, Plaintiff takes issue with the ALJ's use of the word "elected" second surgery as opposed to "recommended" second surgery.   (Pl.'s Brief at 11).  The context in which the ALJ used the word "elected" is shown above in the quote from his decision.  The ALJ does not dispute in his decision that the surgery was recommended, he merely uses the following phrase "he elected to undergo a second…"surgery. The medical records show as follows:  Ms. Mikeo, P.A. for Dr. Bailes noted on December 21, 2010 that "After consideration of his options, he

wishes to proceed with a left L4-5 MLD." (R. at 265). Dr. Young noted on February 3, 2011, the date of surgery that Dr. Bailes had "recommended" that the patient undergo surgery. The undersigned does not assign any error to the ALJ's use of the words "elected to undergo" surgery.

Third, the Plaintiff takes issue with the ALJ's statement that:

> Physical examination findings in March, April, and May 2011 were likewise unremarkable, including no apparent distress, steady gait, with no ataxia, intact motor and sensory function, intact and symmetrical reflexes, intact neurological function, and no erythema or swelling, but the claimant continued to subjectively complain of low back pain, left leg pain and numbness, and lower extremity weakness which treating source and neurologist Dr. Julian Bailes was "at a loss to explain," and for which Dr. Morris continued only conservative treatment and failed to indicate any required limitation in the claimant's activities.

(R. at 23). The undersigned has reviewed the records in question and finds that the statement is supported by the objective medical evidence. The Plaintiff asserts that there are omissions in the ALJ decisions. (Pl.'s Brief at12). For example, the ALJ doesn't mention that Dr. Bailes while "at a loss to explain" Plaintiff's pain, did follow up with an MRI. (*Id*). While the ALJ doesn't make that connection, the ALJ does refer to the May 2011 MRI in his decision and does not find it persuasive in supporting the extent of pain to which the Plaintiff complains. (R. 24). The undersigned finds no error in this regard. This is simply the ALJ's interpretation of the records in conjunction with the testimony at the hearing.

### (c) ALJ faulted Plaintiff for not pursuing further pain management while at the same time noting that two epidural injections had provided no relief.

The Plaintiff argues that the ALJ faulted Plaintiff for not pursuing pain management. (Pl's Brief at 12). The section of the ALJ's decision on this point is as follows:

> An appointment was made for the claimant to be seen at a pain clinic on November 10, 2011, however, the claimant failed to show

> for his appointment and the medical records failed to indicate any
> further action taken by the claimant to follow through with pain
> clinic treatment despite his allegation of totally disabling pain;
> rather, the claimant reported that he wanted to obtain disability
> payments.

(R. at 24).  Dr. Morris's record indicates on January 16, 2012 as follows:  "His pain level is at a 7 today.  He is unable to get any help because he has no insurance and he is waiting to get ss disability…."  Additionally, Plaintiff testified at the hearing that his pain level was a ten before the first surgery and remained a ten after the second and last surgery.  (R. at 43).  These portions of the record do support the ALJ's statement.  The Plaintiff further argues that the ALJ's decision is inconsistent because the ALJ faults Plaintiff for not pursuing further pain management but then later notes that the two injections for pain had provided Plaintiff no relief.  (Pl.'s Brief at 12).  The undersigned finds that argument to be flawed in that there are many forms of pain management other than injections.  Plaintiff has received medication and physical therapy that have both helped his pain in the past.  (R. at 735-745).  Yet, Plaintiff testified that he couldn't do the home exercises the therapist gave him and that physical therapy provided no relief and didn't help. (R. at 49).  Accordingly, the undersigned finds no error in the ALJ's decision in this regard.

In conclusion, the ALJ's reference to Plaintiff's pre alleged onset date pain and condition as illustrated in the January 27, 2010 MRI is just one of many reasons the ALJ used in making his credibility determination. Although an incorrect reading of MRI on January 27, 2010, may have had some effect on the ALJ's decision on credibility, the undersigned finds that the error was regarding only one pre-alleged onset medical record and that the ALJ's other findings regarding the headaches and the post alleged onset MRIs substantially supported the ALJ's credibility analysis as it related to the RFC and ultimate nondisability determination. For these

reasons, the undersigned finds that substantial evidence supports the ALJ's credibility determination and these errors were harmless.

 2. **The ALJ reasonably relied on the VE's testimony as substantial evidence that there are jobs that exist in the national economy that Mr. Wajler can perform.**

At the fifth step of the sequential evaluation, "the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national economy that the claimant can perform given his age, education, and work experience." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The ALJ must consider the claimant's RFC, "age, education, and past work experience to see if [he] can do other work." 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

The ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1566(e), 416.966(e). The Fourth Circuit has held that "[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir.1993) (citing *Walker v. Bowen*, 876 F.2d 1097, 1100 (4th Cir.1989)).

If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. *Edwards v. Bowen*, 672 F. Supp. 230, 235 (E.D.N.C. 1987). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993).

The ALJ's RFC was as follows:

> **After careful consideration of the entire record, the undersigned finds that, since February 3, 2011, the claimant has had the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following limitations: the claimant requires a sit/stand option without breaking task, with the ability to sit, stand, and walk for at least 15 minutes each at a time; the claimant can perform postural movements occasionally, but should do minimal squatting and cannot climb ladders, ropes, or scaffolds; to the maximum extent possible, the claimant should do all walking on level and even surfaces, and the claimant requires a cane for ambulation; the claimant should have no exposure to temperature extremes, wet or humid conditions, or hazards; and lastly, the claimant is limited to unskilled work involving only routine and repetitive instructions and tasks.**

(R. at 21).

Plaintiff argues that the testimony of the vocational expert is not substantial evidence because the ALJ did not include his finding of decreased attention span in reading due to pain in the ALJ's questioning of the vocational expert. (Pl.'s Brief at 14). During the hearing the Plaintiff testified that he had decreased attention span in reading due to pain and his medications. (R. at 41, 48). Although there is nothing in the medical record to support decreased attention in reading, the ALJ took that into consideration in formulating the RFC. (R. at 25). Specifically, the ALJ found:

> However, the undersigned also fully considered the claimant's updated treatment records and the claimant's allegations and gave them some weight, in conjunction with the other relevant evidence as well as the limited weight given to the medical evidence as well as the limited weight given to the medical source statements of Dr. Morris, in finding that the claimant is limited to sedentary work subject to additional exertional and nonexertional limitations, including but not limited to, being limited to unskilled work involving only routine and repetitive instructions and tasks to accommodate the claimant's hearing testimony of decreased

> attention span in reading due to pain as well as to decrease any
> stress that might aggravate the claimant's symptoms.

(R. at 25).  The Plaintiff makes issue with the fact that decreased attention span was not given to the vocational expert in the hypothetical and the occupations given by the vocational expert were reasoning and language levels of 3. (Pl.'s Brief at 14).   Defendant notes that these issues were not addressed on cross examination at the hearing and should not be considered.  (Defs Brief at 12).

The undersigned finds that the vocational expert testified that he had reviewed the vocational aspects of the file. (R. at 55). The ALJ did NOT include in the hypothetical that Plaintiff has a decreased attention span in reading due to pain.  However, the ALJ did include in his hypothetical that Plaintiff was to be limited to unskilled work involving only routine and repetitive instructions and tasks.  The ALJ clearly states in his decision that this part of the hypothetical was given to accommodate the claimant's hearing testimony of decreased attention span in reading due to pain.  The undersigned finds where the record is sparse regarding Plaintiff's actual reading level, the ALJ's hypothetical was appropriate and the vocational expert's opinion was substantial evidence to support the ALJ's decision.

## VI.   RECOMMENDATION

For the reasons stated herein, the undersigned finds that the Commissioner's decision denying the Plaintiff's application for disability insurance benefits and supplemental security income is supported by substantial evidence and there is no legal error. Accordingly, the undersigned RECOMMENDS that the Defendant's Motion for Summary Judgment (ECF No. 16) be GRANTED, the Plaintiff's Motion for Summary Judgment (ECF No. 13) be DENIED, and the decision of the Commissioner be affirmed and this case be DISMISSED WITH PREJUDICE.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendationset forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 1st day of August, 2014.


ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE